## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**KELLIE ANN PETERSON,**

     **Plaintiff,**

     **vs.**                   **Civ. No. 19-486  JFR**

**ANDREW SAUL, Commissioner**
**of SOCIAL SECURITY,**

     **Defendant.**

## MEMORANDUM OPINION AND ORDER[1]

**THIS MATTER** is before the Court on the Social Security Administrative Record (Doc. 13) filed August 7, 2019, in support of Plaintiff Kellie Ann Peterson's ("Plaintiff") Complaint (Doc. 1) seeking review of the decision of Defendant Andrew Saul, Commissioner of the Social Security Administration ("Defendant" or "Commissioner") denying Plaintiff's claim for Title II disability insurance benefits and Title XVI supplemental security income.  On November 22, 2019, Plaintiff filed her Motion to Remand.  Doc. 23.  The Commissioner filed a Response in opposition on February 24, 2020 (Doc. 28), and Plaintiff filed a Reply on March 9, 2020 (Doc. 29).  The Court has jurisdiction to review the Commissioner's final decision under 42 U.S.C. §§ 405(g) and 1383(c).  Having meticulously reviewed the entire record and the applicable law and being fully advised in the premises, the Court finds the Motion is well taken and is **GRANTED.**

---

[1] Pursuant to 28 U.S.C. § 636(c), the parties consented to the undersigned to conduct any or all proceedings, and to enter an order of judgment, in this case.  Docs. 3, 5, 6.

## I.  Background and Procedural History

Claimant Kellie Ann Peterson ("Ms. Peterson") alleges that she became disabled on July 1, 2012, at the age of forty-six, because of complicated migraines with neurological deficits; asthma allergies; low blood pressure; presumptive transient ischemic attacks; bilateral hearing loss; premenopausal; uterine fibroids; hypoglycemia; irritable bowel syndrome; hypothyroidism; and reactive airway disease sleep apnea.  Tr. 334, 349.[2]  Ms. Peterson has a master's degree in divinity, and has worked as a school bus driver, a career and personal training instructor, a parent coach and advocate, and a social worker providing case management.  Tr. 40, 337, 351.

### A.      Relevant Medical History

The relevant medical record evidence demonstrates that Ms. Peterson presented for emergency care on December 7, 2012, with complaints of difficulty breathing.  Tr. 550-53. Ms. Peterson explained that she was driving a school bus when she developed significant difficulty breathing triggered by heavy odors of perfume and cologne.  *Id.*  Ms. Peterson also reported a recent albuterol treatment for a chest cold, and that she had been off of allergy medications.  *Id.*  Laboratory studies and an ECG were normal.  *Id.*  Ms. Peterson was ultimately diagnosed with pneumonia and acute exacerbation of asthma.  *Id.*  She was treated with Azithromycin, provided with prescriptions for Claritin and Atrovent, and instructed to follow up with her primary care physician.  *Id.*

Two and a half weeks later, on December 24, 2012, Ms. Peterson presented again for emergency care complaining of difficulty breathing, lightheadedness, and tunnel vision.  Tr. 538-40.  Ms. Peterson was feeling better by the time she was medically screened by a physician and

---

[2] Citations to "Tr." are to the Transcript of the Administrative Record (Doc. 13) that was lodged with the Court on August 7, 2019.

was discharged.  *Id.*  She was diagnosed with dyspnea and instructed to follow up with her primary care physician.  *Id.*

On February 27, 2013, Ms. Peterson presented to Mark Schuyler, M.D., complaining of asthma, anaphylactic shock, and angioedema.  Tr. 461-63.  Ms. Peterson reported multiple episodes of anaphylactic shock starting in November 2012, that included symptoms of swelling, hoarse voice, hives, dyspnea, fainting, vertigo, and falling to the ground with seizure type movements.  *Id.*  Dr. Schuyler ordered and performed allergy skin tests and diagnosed vocal cord dysfunction and perennial allergic rhinitis.  *Id.*  Ms. Peterson saw Dr. Schuyler for one follow-up appointment on March 20, 2013, and reported no episodes since her last visit.  Tr. 491, 582, 460-61.  Dr. Schuyler's diagnosis remained the same.  *Id.*

Nine months later, on November 5, 2013, Ms. Peterson presented for emergency care complaining of difficulty breathing.  Tr. 859-64.  Ms. Peterson reported she was at an office where she had an allergic reaction to scented perfume.  *Id.*  Ms. Peterson was discharged with a diagnosis of acute allergic reaction.  *Id.*

Approximately one year later, on December 29, 2014, Ms. Peterson presented for emergency care complaining of "vague neurological symptoms."  Tr. 546-49.  Ms. Peterson reported a "complex medical history including some sort of autonomic nervous system dysfunction," extensive allergies and sensitivities, memory lapses, and falling episodes.  *Id.*  An MRI demonstrated no "white matter lesions characteristic of multiple sclerosis."  *Id.*  Ms. Peterson was diagnosed with a neurological problem, encouraged to follow up with her primary care physician, and referred to neurology.  Tr. 546-49.

On January 5, 2015, Ms. Peterson presented for emergency care complaining of increased falls, followed by an inability to move bilateral upper and lower extremities and weakness.  Tr.

3

523-30, 540-42.  Ms. Peterson reported that she had a sudden onset of headaches on

December 12, 2014, and had been experiencing falling episodes since then.  *Id.*  Upon admission,

MRI and CT studies of the head were normal, as were MRI studies of the cervical, thoracic and

lumbar spine.  Tr. 517-22.  An EEG was also normal and indicated that Ms. Peterson's described

behavior, *i.e.,* lack of awareness, tremor, loss of control and sensation on right side, eye flutter,

speech arrest/difficulty, severe headaches and loss of memory, "was consistent with a

psychogenic attack."  Tr. 497.  Ms. Peterson's neurological exam was deemed "mostly consistent

with psychosomatic disorder due to the presence of giveaway weakness in all 4 extremities with

intact reflexes and sensory examination."  Tr. 526.  Ms. Peterson's neurologic condition

improved by January 7, 2015, and she was discharged home with outpatient physical and

occupational therapy.  Tr. 528.  She was also referred for follow up with Neurology and

Psychiatry Clinic.  *Id.*

On January 9, 2015, Ms. Peterson established care with Family Care Practitioner Jennifer

Benson, M.D.  Tr. 482-87, 580-82.  Ms. Peterson complained of muscle weakness, falling,

blurred vision, leg and hand numbness, and mental confusion.  *Id.*  Dr. Benson ordered additional

laboratory studies,[3] and noted that Ms. Peterson was scheduled with Southwest Medical

Associates Neurology.  Tr. 582.  Dr. Benson provided primary care to Ms. Peterson throughout

2015 and 2016.  Tr. 559-62, 565-68, 569-72, 573-75, 576-77, 578-79, 623-25.  Dr. Benson

primarily prescribed and/or refilled various medications and provided specialist referrals as

deemed necessary.[4]

---

[3] Dr. Benson ordered a Lyme antibody, creatinine phosphokinase, liver function test, TSH and free-T4.  Tr. 582.

[4] On January 27, 2015, Dr. Benson prescribed Nasacort and referred Ms. Peterson to cardiology (Tr. 579); on
March 31, 2015, Dr. Benson refilled Adjuvant (Tr. 577); on January 7, 2016, Dr. Benson prescribed Topamax for
migraines, refilled Levothyroxine prescription, referred Ms. Peterson to UNM's Headache Clinic, and encouraged
her follow up with neurologist (Tr. 568); on April 4, 2016, Dr. Benson refilled Sumatriptan, Singulair and Ventolin
and urged Ms. Peterson to establish with Neurology as soon as possible (Tr. 561); on November 21 2016,

4

On January 13, 2015, Ms. Peterson presented to Neurologist Vanessa Licona-Sanjuan, M.D., with complaints of falls and syncope.  Tr. 452-54.  Ms. Peterson reported a history of right-sided weakness, lower extremity weakness, and speech difficulties.  *Id.*  Dr. Licona-Sanjuan noted on physical exam that Ms. Peterson had "excessive eye fluttering, she could not tolerate Hallpike maneuver/Vestibulo ocular reflexes exam."  Tr. 454.  Dr. Licona-Sanjuan ordered VNG, EMG and NCS studies of Ms. Peterson's lower extremities for evaluation of peripheral neuropathy.  *Id.*  She indicated that if workup did not reveal a cause for Ms. Peterson's syncope, she would refer Mr. Peterson to UNM's Somatoform Clinic.  *Id.*  Dr. Licona-Sanjuan saw Ms. Peterson five times in 2015, and saw her twice in 2017.  Tr. 449-51.  On May 6, 2015, Dr. Licona-Sanjuan noted that there was no convincing evidence of neuropathy based on the EMG and NCS studies.  Tr. 447.  On November 17, 2015, Dr. Licona-Sanjuan noted that hemiplegic migraine genetic testing was negative.  Tr. 441.  Dr. Licona-Sanjuan prescribed Sumatriptan and Nortriptyline for Ms. Peterson's migraine headaches.  *Id.*

On April 28, 2016, Ms. Peterson presented to Neurologist Ritika Mahajan, M.D., with complaints of headaches, confusion, and gait abnormality.  Tr. 667-74.  She reported headaches with episodes of neurological symptoms occurring 25 days per months.  *Id.*  Dr. Mahajan noted on physical exam that Ms. Peterson had an episode in which she "started having random tremors in her whole body.  Then while asking her to walk to check her gait she was very unstable.  Her gait was consistent with astasia-abasia.  She had to sit down and her caregiver helped her to sit back down on the chair.  She was almost falling."  Tr. 668.  Ms. Peterson described this as typical of her episodes.  *Id.*  Dr. Mahajan indicated that past extensive workup had been normal

---

Dr. Benson provided a letter stating that Ms. Peterson's multiple chemical sensitivities and resultant migraines with neurological symptoms would be better if she were to use portable oxygen when outside her home (Tr. 624-25).

and that Ms. Peterson had a diagnosis of complicated migraines "since no other possibility could

be found." Tr. 674. Dr. Mahajan assessed that the episode she witnessed on exam was

consistent with a psychogenic spell, and stated that it was "functional and not neurological." *Id.*

Dr. Mahajan referred Ms. Peterson to psychology for therapy and to neuropsychology for

neuropsychological testing. *Id.* In follow up on July 19, 2016, Dr. Mahajan had a prolonged

discussion with Ms. Peterson regarding the nature of her seizure-like episodes being psychogenic

and recommended that Ms. Peterson be evaluated and treated by a psychiatrist and psychologist

as opposed to being treated with medications. Tr. 675-76. Dr. Mahajan referred Ms. Peterson to

psychiatry. *Id.*

On September 26, 2016, and October 3, 2016, Ms. Peterson, based on a referral by

Dr. Mahajan, presented to Neuropsychologist Carole A. Mazurowski, Ph.D., for cognitive and

emotional evaluation. Tr. 591-600. Ms. Peterson reported that she had not worked since 2012

"when she collapsed while driving a school bus and got a fibroid tumor and pneumonia at the

same time and collapsed at work and wasn't able to go back." Tr. 593. Ms. Peterson reported a

history of, *inter alia,* TIAs, migraines, extremity weakness and trembling, fainting spells,

frequent falls, dizziness, and slurred speech. Tr. 592. Dr. Mazurowski administered a battery of

tests.[5] Tr. 594-599. Dr. Mazurowski's Summary and Recommendations were are follows:

> Although Ms. Peterson's overall score on the WAIS-IV was in the higher end of
> the average range, it is somewhat lower than expected for an individual pursuing a
> graduate degree. Among the working memory tasks, she did well on those that
> did not involve multi-step verbal arithmetic – in contrast to her estimates of
> severely impaired executive functioning in daily life. Processing speed was in the
> average range, with mild variability in how she does on tasks requiring close

---

[5] Dr. Mazurowski administered the Wechsler Adult Intelligence Scale-IV; Neuropsychological Assessment Battery;
Wisconsin Card Sorting Test-64; ; Delis-Kaplan Executive Function Systems Tests; Behavior Rating Inventory of
Executive Function – Adult Version; and Minnesota Multiphasic Personality Inventory. Tr. 594-99.

attention – and perfect performance on the most complex attention task.  Memory
scores were within the average range overall, with visual memory being a
strength,  She did have mild difficulty with initial encoding of lengthy material
and some interference between types of information that were similar.  However,
what she eventually learned was generally well recalled after a delay.  Visual and
verbal abilities remain intact.  Performance was also within the average to high
average range for most executive functioning tasks.  The only one she had
difficulty with was generating 3-letter words from a limited list of letters.  On a
questionnaire about executive functioning in daily life, Ms. Peterson's scores
indicated severely impaired working memory and ability to shift between
activities and ideas.

Although Ms. Peterson's scores may be lower than expected in some areas, the
pattern does not conform to what would be seen if there had been injury to the
right hemisphere – as would be the case with the left-sided weakness she
described.  In that case, there would have been difficulty with visual reasoning –
whereas visual reasoning scored slightly higher than verbal reasoning during this
testing.

Her answers on the MMPI indicated a personality patten wherein stress can
contribute to development of physical symptoms.

Tr. 600.  Dr. Mazurowski diagnosed Mild Neurocognitive Disorder due to multiple etiologies.

*Id.*  She stated that contributions to this diagnosis included a history of migraines, possible TIAs

and seizures disorder, with the seizures likely being psychogenic.  *Id.*  This indicates a diagnosis

of Functional Neurological Symptom Disorder with mixed symptoms of seizures, abnormal

movement and speech – persistent, without identified psychological stressor.  *Id.*

Dr. Mazurowski recommended, *inter alia,* that Ms. Peterson seek psychotherapy to learn

strategies for stress management and biofeedback to help her deal with physiological symptoms

accompanying her stress.  *Id.*

On November 9, 2016, Ms. Peterson began counseling with Psychologist Mary Ann

Conley, Ph.D., and saw Dr. Conley sometimes weekly but also up to two months between visits

through January 2018.  Tr. 751.  The Administrative Record contains fifteen treatment notes

generated in 2017.  Tr.654-62, 742-43.  On January 31, 2018, Dr. Conley prepared a *Medical*

7

*Disorder Questionnaire Form* on Ms. Peterson's behalf.  Tr. 747-51.  Dr. Conley noted therein

that Ms. Peterson was generally driven to her appointments by a caretaker, her mother, or her

husband, and that on three or four occasions Ms. Peterson required assistance ambulating as she

was leaving.  Tr. 747.  Dr. Conley indicated that Ms. Peterson had symptoms of, *inter alia*,

depression, PTSD, anxiety, insomnia, nightmares, severe migraines, TIAs, difficulty speaking,

dizziness, and chemical sensitivities.  *Id.*  Dr. Conley indicated diagnoses of Dissociative

Identity Disorder and Anxiety Disorder.  *Id.*  Dr. Conley assessed Ms. Peterson's current level of

functioning as follows:

> A.  Present Daily Activities:  . . .  The patient has assistance in completing
> household tasks such as cleaning, cooking and driving.  She has assistance with
> shopping & usually goes with a caretaker.
>
> B.  Social Functioning:  . . .  The ability to interact with family appears good.
> Because of chemical sensitivities she is limited in excursions or work places away
> from home.  Ex. Unable to complete an internship at a synagogue due to cleaning
> chemicals encountered there.
>
> C.  Concentration and Task Completion:  . . .  Ms. Peterson was able to complete
> an online MA degree.  She had support re household tasks.  Was often overcome
> by fatigue.
>
> D.  Adaptation to Work or Work-Like Stressors:  . . .  For many of the reasons
> provided above, Ms. Peterson would not adapt well to a work place outside the
> home.

Tr. 749-50.

## B.   Applications

On March 8, 2016, Ms. Peterson filed an application for Supplemental Security Income

under Title XVI of the Social Security Act, 42 U.S.C. § 1381 *et seq*.  Tr. 220-228.  On March 9,

2016, Ms. Peterson filed an application for Social Security Disability Insurance Benefits under

Title II of the Social Security Act, 42 U.S.C. § 401.  Tr. 229-30.  State Agency medical

consultant Frederick Cremona, M.D., reviewed the medical record evidence at the initial level of

consideration and concluded that

> [n]eurological exams show[] that the cause of the clmt condition and complaints
> appears to be a side effect of a psychosomatic disorder as muscle strength[], tone
> and a[n] MRI of brain has all come back normal.  She was positive Hoover's sign
> and an astasia abasia type of gait.  The Neuro exam showed inconsistent with
> giveaway weakness in all 4 extremities and [] intact reflexes and sensory.
> 04/2016 neurological exam shows no abnormalities grossly.  Testing at her Neuro
> referral to SW shows normal gait and balance, with a[n] overall normal Neuro
> exams[.]  The Clmt has a behavior of switching doctors.  The Clmt statements on
> the function reports are very inconsistent with the objective evidence and found
> overall the clmt and 3rd party are innocent reports.  Overall the Clmt does not
> have a severe impairment that would physically limit her from work.

Tr. 96, 98, 108-111.  State Agency psychological consultant Jill Blacharsh, M.D., reviewed the

medical record evidence at the initial level and concluded that

> [t]he Clmt states problems with neurological condition that affect her abilities
> with memory, completing tasks, concentration, understanding, following
> instruction, and attention.  Multiple doctors and neurological experts' records
> show that she has no permanent severe impairments in this area.  Initially thought
> to be psychosomatic.  As headaches came more to the forefront with these
> symptoms, and extensive work-up was negative, migraine headaches came to be
> understood as causing Clmt's complex reversible neurological/cognitive
> symptoms.  Complex migraine headaches with neurological deficits replaced
> diagnosis of psychosomatic disorder.  Therefore no MDI at this time.  In light of
> consistently normal MSE's from 2012 through 2016, further development is not
> warranted.

Tr. 99-101, 111-113.  It was determined, therefore, that Ms. Peterson's impairments or

combination of impairments did not significantly limit her physical or mental ability to do basic

work activities.  Tr. 101, 113.  As such, Ms. Peterson's applications were initially denied on

August 26, 2016.  Tr. 90, 91, 92-103, 104-115, 150-53, 154-57.

At reconsideration, State Agency medical consultant Lawrence Schaffzin, M.D.,

reviewed the medical record evidence and assessed that, although Ms. Peterson alleged her

condition had worsened, she still had no significant physical limitations.  Tr. 121-22, 136-38.

Stage Agency psychological consultant Aroon Suansilppongse, M.D., reviewed the medical evidence record and prepared a Psychiatric Review Technique in which he assessed that Ms. Peterson had moderate limitations in her daily activities, maintaining social functioning, and maintaining concentration, persistence and pace.  Tr. 123-24, 138-39.  Dr. Suansilppongse also prepared a Mental Residual Functional Capacity Assessment, and assessed that Ms. Peterson had moderate limitations in her ability to (1) maintain attention and concentration for extended periods; (2) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (3) interact appropriately with the general public; (4) accept instructions and respond appropriately to criticisms from supervisors; (5) set realistic goals or make plans independently of others.  Tr. 125-27, 140-42.  In support, Dr. Suansilppongse explained that Ms. Peterson's anxiety and depressive reaction as well as alleged headaches/fatigue would interfere with her ability for sustained concentration and persistence or for task completion, but that she would be able to complete tasks at an acceptable pace; that Ms. Peterson's social avoidance and infrequent episodes of panic attacks would occasionally interfere with her ability to interact appropriately with supervisors, coworkers or the public, but that she would be able to complete tasks with infrequent contact with others; and that Ms. Peterson's transient cognitive dysfunction and depressive reaction would occasionally interfere with her ability to set realistic goals or make plans independently of others.  *Id.* Dr. Suansilppongse further explained that Ms. Peterson's psychiatric impairment severity did not meet or equal any Listing, and that Ms. Peterson had the mental capacity for work related activity with minimal limitation due to alleged headaches/fatigue.  Tr. 127, 142. Dr. Suansilppongse also indicated that Ms. Peterson's allegations were partially supported and

10

not inconsistent with medical evidence.  *Id.*  Finally, Dr. Suansilppongse indicated that

Dr. Mazurowski's psychological evaluation report contained brief and ambiguous descriptions of

claimant's functional domains that seemed to underestimate her functional ability and were

inconsistent with her longitudinal psychiatric history and clinical psychopathology.  *Id.*  As such,

Dr. Suansilppongse gave little weight to Dr. Mazurowski's report.  *Id.*  Thus, based on the

evidence in the file, Ms. Peterson's applications were denied again at reconsideration on

December 12, 2016.  Tr. 116-30, 131-45, 146, 147, 160-65.

On January 17, 2017, Ms. Peterson requested a hearing before an Administrative Law

Judge ("ALJ").  Tr. 167-69.  ALJ Raul Pardo conducted a hearing on February 15, 2018.  Tr. 35-

89.  Ms. Peterson appeared in person at the hearing with attorney representative Feliz Martone.

*Id.*  The ALJ took testimony from Ms. Miller, and an impartial vocational expert ("VE"), Molly

Kelly.  *Id.*  Ms. Peterson testified at the hearing that her complicated migraines and associated

neurological deficits, along with her chemical sensitivities, are the primary impairments that

prevent her from working.  Tr. 47-48.  Ms. Peterson testified that her chemical sensitivities can

result in anaphylactic shock up to five times a week and that they, along with her PTSD, trigger

migraines which result in partial paralysis, an inability to speak, and mental confusion.  Tr. 48-

49, 53.  Ms. Peterson testified she generally has migraines two times a week.  Tr. 53.

Ms. Peterson testified she has a service dog, requires a family member or friend to take her to

doctor appointments and do her grocery shopping, and uses portable oxygen to help with her

migraines.  Tr. 51-52, 54, 61.  Ms. Peterson also testified that she can sit and/or stand for only

forty-five minutes to an hour and can walk about a mile.  Tr. 72-73.  Ms. Peterson further

testified that she has been unable to secure employment with a synagogue since graduating with

her divinity degree in December 2017 because she has not found a synagogue that is willing to

11

remove all the chemicals used for cleaning and to disallow people from wearing perfumes and/or colognes.  Tr. 41.

On July 23, 2018, ALJ Pardo issued an unfavorable decision.  Tr. 14-28.  On March 26, 2019, the Appeals Council issued its decision denying Ms. Peterson's request for review and upholding the ALJ's final decision.  Tr. 1-5.  On May 24, 2019, Ms. Peterson timely filed a Complaint seeking judicial review of the Commissioner's final decision.  Doc. 1.

## II.  Applicable Law

### A.  Disability Determination Process

An individual is considered disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A) (pertaining to disability insurance benefits); *see also* 42 U.S.C. § 1382(a)(3)(A) (pertaining to supplemental security income disability benefits for adult individuals).  The Social Security Commissioner has adopted the familiar five-step sequential analysis to determine whether a person satisfies the statutory criteria as follows:

(1)     At step one, the ALJ must determine whether the claimant is engaged in "substantial gainful activity."[6]  If the claimant is engaged in substantial gainful activity, she is not disabled regardless of her medical condition.

(2)     At step two, the ALJ must determine the severity of the claimed physical or mental impairment(s).  If the claimant does not have an impairment(s) or combination of impairments that is severe and meets the duration requirement, she is not disabled.

---

[6] Substantial work activity is work activity that involves doing significant physical or mental activities."  20 C.F.R. §§ 404.1572(a), 416.972(a).  "Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before."  *Id.*  "Gainful work activity is work activity that you do for pay or profit."  20 C.F.R. §§ 404.1572(b), 416.972(b).

(3)    At step three, the ALJ must determine whether a claimant's impairment(s) meets or equals in severity one of the listings described in Appendix 1 of the regulations and meets the duration requirement.  If so, a claimant is presumed disabled.

(4)    If, however, the claimant's impairments do not meet or equal in severity one of the listings described in Appendix 1 of the regulations, the ALJ must determine at step four whether the claimant can perform her "past relevant work."  Answering this question involves three phases. *Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996). First, the ALJ considers all of the relevant medical and other evidence and determines what is "the most [claimant] can still do despite [his physical and mental] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). This is called the claimant's residual functional capacity ("RFC"). *Id.* §§ 404.1545(a)(3), 416.945(a)(3). Second, the ALJ determines the physical and mental demands of claimant's past work.  Third, the ALJ determines whether, given claimant's RFC, the claimant is capable of meeting those demands. A claimant who is capable of returning to past relevant work is not disabled.

(5)    If the claimant does not have the RFC to perform her past relevant work, the Commissioner, at step five, must show that the claimant is able to perform other work in the national economy, considering the claimant's RFC, age, education, and work experience.  If the Commissioner is unable to make that showing, the claimant is deemed disabled. If, however, the Commissioner is able to make the required showing, the claimant is deemed not disabled.

*See* 20 C.F.R. § 404.1520(a)(4) (disability insurance benefits); 20 C.F.R. § 416.920(a)(4) (supplemental security income disability benefits); *Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005); *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005).  The claimant has the initial burden of establishing a disability in the first four steps of this analysis.  *Bowen v. Yuckert*, 482 U.S. 137, 146, n.5.  The burden shifts to the Commissioner at step five to show that the claimant is capable of performing work in the national economy.  *Id.*  A finding that the claimant is disabled or not disabled at any point in the five-step review is conclusive and terminates the analysis.  *Casias v. Sec'y of Health & Human Serv.*, 933 F.2d 799, 801 (10th Cir. 1991).

B.    **Standard of Review**

This Court must affirm the Commissioner's denial of social security benefits unless
(1) the decision is not supported by "substantial evidence" or (2) the ALJ did not apply the
proper legal standards in reaching the decision. 42 U.S.C. § 405(g); *Hamlin v. Barnhart*, 365
F.3d 1208, 1214 (10th Cir. 2004); *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004);
*Casias*, 933 F.2d at 800-01. In making these determinations, the Court "neither reweigh[s] the
evidence nor substitute[s] [its] judgment for that of the agency.'" *Bowman v. Astrue*, 511 F.3d
1270, 1272 (10th Cir. 2008). "[W]hatever the meaning of 'substantial' in other contexts, the
threshold for such evidentiary sufficiency is not high." *Biestek v. Berryhill*, 139 S. Ct. 1148,
1154 (2019). Substantial evidence "is 'more than a mere scintilla.'" *Id.* (quoting *Consol. Edison
Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "It means—and means only—such relevant evidence
as a reasonable mind might accept as adequate to support a conclusion." *Id.* (internal quotation
marks omitted).

A decision "is not based on substantial evidence if it is overwhelmed by other evidence in
the record," *Langley*, 373 F.3d at 1118, or "constitutes mere conclusion," *Musgrave v. Sullivan*,
966 F.2d 1371, 1374 (10th Cir. 1992). The agency decision must "provide this court with a
sufficient basis to determine that appropriate legal principles have been followed." *Jensen v.
Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005). Therefore, although an ALJ is not required to
discuss every piece of evidence, "the record must demonstrate that the ALJ considered all of the
evidence," and "the [ALJ's] reasons for finding a claimant not disabled" must be "articulated
with sufficient particularity." *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996). But
where the reviewing court "can follow the adjudicator's reasoning" in conducting its review,
"and can determine that correct legal standards have been applied, merely technical omissions in
the ALJ's reasoning do not dictate reversal." *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1166

14

(10th Cir. 2012). The court "should, indeed must, exercise common sense." *Id.* "The more comprehensive the ALJ's explanation, the easier [the] task; but [the court] cannot insist on technical perfection." *Id.*

### III.  <u>Analysis</u>

The ALJ made his decision that Ms. Peterson was not disabled at step five of the sequential evaluation. Tr. 26-28.  Specifically, the ALJ found that Ms. Peterson met the insured status requirements through March 31, 2019, and had not engaged in substantial gainful activity since her alleged onset date of July 1, 2012. Tr. 19-20.  The ALJ determined that Ms. Peterson had severe impairments of migraines, asthma, seizures, allergic rhinitis, post-traumatic stress disorder, post three transient ischemic attacks, left ear hearing loss, depression and anxiety.  Tr. 20.  The ALJ determined that Ms. Peterson did not have an impairment or combination of impairments that met or medically equaled the severity of a listing. Tr. 20-21.  Proceeding to step four, the ALJ, after careful consideration of the record, found that Ms. Peterson had the residual functional capacity to

> perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she can lift, carry, push, and pull 20 pounds occasionally and 10 pounds frequently. She can sit for six hours, stand for six hours, and walk for six hours in an eight-hour workday.  The claimant can climb ramps and stairs occasionally, but never clime ladders, ropes, or scaffolds.  She can balance occasionally and stoop occasionally.  The claimant can work at unprotected heights occasionally because of her migraines, and work around moving mechanical parts occasionally.  She must avoid working in dust, odors, fumes and pulmonary irritants occasionally. She is limited to perform simple, routine tasks and having only occasional contact with the public.

Tr. 22-26.  The ALJ further concluded at step four that Ms. Peterson was not capable of performing her past relevant work as a counselor for social services.  Tr. 26.  Based on the RFC and the testimony of the VE, the ALJ concluded at step five that there were jobs that exist in

significant numbers in the national economy that Ms. Peterson could perform and that she was, therefore, not disabled.[7]  Tr. 26-28.

In her Motion, Ms. Peterson argues that the ALJ improperly assessed the RFC by (1) failing to make a connection between the assessed impairments and the RFC; and (2) failing to properly consider the opinion evidence.  Doc. 23 at 5-15.  Ms. Peterson also argues that the ALJ failed to carry the burden of proof at step five because he improperly relied on the job of laundry sorter after hearing testimony from the VE that it would not work due to exposure to humidity.  *Id.* at 16-17.  Ms. Peterson goes on to argue that with the job of laundry sorter eliminated, the ALJ provided no rationale for a finding that the 32,000 jobs that remain represents a significant number.  *Id.* at 18-19.

For the reasons discussed below, the Court finds that the ALJ failed to apply the correct legal standards in determining Ms. Peterson's RFC and that is it not supported by substantial evidence.  For these reasons, this case requires remand.

A.    **RFC Assessment**

Ms. Peterson argues generally that the ALJ provided no explanation for linking his RFC assessment to the evidence.  Doc. 23 at 5.  In particular, Ms. Peterson argues that the ALJ failed to explain how the evidence supports her ability to do light level work given the severe impairments the ALJ assessed, and because her treating psychologist, Dr. Conley, indicated Ms. Peterson is driven to her appointments, often needs help with ambulating when leaving, requires assistance with her activities of daily living, and would not adapt well to a work place

---

[7] The ALJ identified (1) office worker, DOT 239.567-010 (18,000 jobs nationally); (2) laundry sorter, DOT 361.687-014 (6,000 jobs nationally); and (3) hand bader paper goods, DOT 920.687-026 (8,000 jobs nationally). Tr. 27.

outside the home.  *Id.* at 5-11. Ms. Peterson also contends that the ALJ improperly evaluated

certain of the opinion evidence in assessing Ms. Peterson's RFC by failing to perform the

requisite treating source analysis, and failing to account for medical opinion evidence that she

had moderate limitations in sustained concentration and persistence and should only have

infrequent contact with others.  *Id.* at 11-15.

       The Commissioner contends that the ALJ provided a reasonable explanation in his

narrative discussion of how the evidence supported the RFC assessment, and that the ALJ was

not required to separately discuss and make findings regarding each limitation in the RFC

finding.  Doc. 28 at 12-15.  The Commissioner further contends that the ALJ reasonably weighed

the opinion evidence, resolved any conflicts between the medical opinions, and that the weight

the ALJ accorded the medical source evidence does not conflict with the ALJ's RFC.  *Id.* at 15-

18.  The Commissioner further contends that Ms. Peterson is essentially asking the Court to

reweigh the evidence in her favor, which the Court should reject.  *Id.* at 13.

       In assessing a claimant's RFC at step four, the ALJ must consider the combined effect of

all of the claimant's medically determinable impairments, and review all of the evidence in the

record.  *Wells v. Colvin*, 727 F.3d 1061, 1065 (10th Cir. 2013); *see* 20 C.F.R. §§ 404.1545(a)(2)

and (3), 416.945(a)(2) and (3).  Most importantly, the ALJ's "RFC assessment must include a

narrative discussion describing how the evidence supports each conclusion, citing specific

medical facts . . . and nonmedical evidence."  *Wells*, 727 F.3d at 1065 (quoting SSR 96-8p, 1996

WL 374184, at *7).  When the ALJ fails to provide a narrative discussion describing how the

evidence supports each conclusion, citing to specific medical facts and nonmedical evidence, the

court will conclude that his RFC conclusions are not supported by substantial evidence.  *See*

*Southard v. Barnhart*, 72 F. App'x 781, 784-85 (10th Cir. 2003).  The ALJ's decision must be

sufficiently articulated so that it is capable of meaningful review. *See Spicer v. Barnhart*, 64 F. App'x 173, 177-78 (10th Cir. 2003).

Here, the ALJ's determination provides a summary of the evidence he reviewed and considered. Tr. 22-26. That said, the ALJ failed to properly explain how the summarized evidence supported his RFC conclusion as required. The ALJ is charged with carefully considering all of the relevant evidence and linking his findings to specific evidence. *Clifton v. Chater,* 79 F.3d 1007, 1009–10 (10th Cir.1996) (holding "[t]he record must demonstrate that the ALJ considered all of the evidence," and, while he needn't discuss every piece of evidence, the ALJ must "discuss[ ] the evidence supporting his decision, ... the uncontroverted evidence he chooses not to rely upon, [and] significantly probative evidence he rejects").

To begin, there is no medical record opinion evidence that assessed specific limitations on Ms. Peterson's ability to do work-related physical activities. To the contrary, both State Agency medical consultants, based on their medical record evidence review, concluded that Ms. Peterson did not have a severe impairment that would physically limit her from work. Tr. 98, 110, 122, 137. The ALJ, however, rejected their assessments and stated, without more, that "[a]fter reviewing the file and listening to claimant's testimony, I find that [the consultant assessments are] not consistent with the medical evidence summarized above." Tr. 25. The ALJ then limited Ms. Peterson's ability to do work-related physical activities to light exertional work with certain postural and environmental restrictions.[8] This is insufficient because it fails to link specific evidence to the ALJ's RFC, and the Court is not required nor empowered to parse through the summarized evidence to find support for the ALJ's decision. *Gutierrez v. Colvin*, 67

---

[8] Light work involves lifting no more than 20 pounds at a time and 10 pounds frequently, and involves a good deal of walking or standing. 20 C.F.R. §§ 404.1567(b) and 416.967(b).

F. Supp. 3d 1198, 1203 (D. Colo. 2014). Further, by failing to be specific, the Court is left to speculate which part of Ms. Peterson's testimony and which part of the medical evidence "summarized above" the ALJ accepted or rejected, and his reasons for doing so, to make his RFC determination, which it cannot do. *See Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995) (quoting *Reyes v. Bowen*, 845 F.2d 242, 244 (10th Cir. 1988)) ("It is well settled the administrative agencies must give reasons for their decisions."); *see also Haga v. Astrue*, 482 F.3d 1205, 1207-08 (10th Cir. 2007) ("this court may not create or adopt post-hoc rationalizations to support the ALJ's decision that are not apparent from the ALJ's decision itself.").

Additionally, the ALJ improperly evaluated certain of the medical opinion evidence in determining the RFC. It is undisputed that Dr. Conley is Ms. Peterson's treating psychologist and the only treating source who provided a functional assessment of Ms. Peterson's ability to do work-related mental activities. Therefore, the ALJ was required to evaluate her opinion pursuant to the two-part treating physician inquiry. *Krauser v. Astrue*, 638 F.3d 1324, 1330 (10th Cir. 2011). First, the ALJ must determine whether the treating physician's opinion is entitled to controlling weight. *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003); 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Second, if the treating physician's opinion is inconsistent with the record or not supported by medical evidence, the opinion does not merit controlling weight but is still entitled to deference and must be weighed using the following six factors:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Watkins v. Barnhart*, 350 F.3d 1297, 1301 (10th Cir. 2003) (internal citations and quotations omitted); *see also* 20 C.F.R. §§ 404.1527(c), 416.927(c).  Not every factor is applicable in every case, nor should all six factors be seen as absolutely necessary. What is necessary, however, is that the ALJ give good reasons—reasons that are "sufficiently specific to [be] clear to any subsequent reviewers"—for the weight that he ultimately assigns to the opinions. *Langley*, 373 F.3d at 1119; *see also* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *Branum v. Barnhart*, 385 F.3d 1268, 1275 (10th Cir. 2004).  "In choosing to reject the treating physician's assessment, an ALJ may not make speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence[.]"  *Langley*, 373 F.3d at 1121.

Here, the ALJ discussed Dr. Conley's opinion at step four of the sequential evaluation process.  Tr. 24-25.  In doing so, the ALJ did not evaluate Dr. Conley's opinion pursuant to the two-part treating physician inquiry as he was required to do.  At step one, the ALJ did not expressly state whether he had given Dr. Conley's opinion controlling weight.  That said, because it is clear from the ALJ's decision that he declined to give Dr. Conley's controlling weight, this is not reversible error.  *See Mays v. Colvin*, 739 F.3d 569, 575 (10th Cir. 2014) (finding no reversible error when the ALJ did not expressly state whether he had given a treatment physician controlling weight because the Court could tell from the decision that the ALJ declined to give controlling weight).  At step two, the ALJ accorded Dr. Conley's opinion moderate weight and explained in relevant part that "[t]he treating psychologist did not foresee a significant improvement in the claimant's condition.  However, this is not entirely consistent

with the statements of Dr. Mazurowski and Mr. Malcolm [sic] discussed above."[9]  Tr. 25.

Inconsistency, therefore, was the only reason the ALJ provided for discounting Dr. Conley's

opinion.  There are two significant problems, however, with the ALJ's step two evaluation of

Dr. Conley's opinion.

First, the ALJ did not incorporate any of Dr. Conley's limitations into the RFC despite

having accorded her opinion moderate weight.  In her functional assessment, Dr. Conley

indicated that Ms. Peterson required assistance in completing household tasks such as cleaning,

cooking, shopping and driving.  Tr. 749.  She further assessed that "[b]ecause of chemical

sensitivities [Ms. Peterson] is limited in excursions or work places away from home."  Tr. 750.

Finally, she assessed that Ms. Peterson "would not adapt well to a work place outside the home."

*Id.*  The RFC does not account for any of these limitations.  As such, the ALJ clearly rejected

Dr. Conley's opinion by not incorporating into the RFC any of the functional limitations

Dr. Conley assessed.

Second, the ALJ rejected Dr. Conley's assessment in the absence of contradictory

medical evidence.  This is error.  *See Langley v. Barnhart*, 373 F.3d 1116, 1121 (10th Cir. 2004)

(holding that an ALJ may choose to reject a treating physician's opinion only on the basis of

contradictory medical evidence).  Although the ALJ states that Dr. Conley's assessment is

inconsistent with *statements* by Dr. Mazurowski and Dr. Mahajan, the ALJ's explanation is not

supported by substantial evidence.  Neither Dr. Mazurowski nor Dr. Mahajan assessed any

functional limitations related to Ms. Peterson's ability to do work-related mental activities.  To

the contrary, their *statements* consisted of diagnoses and suggested therapies.  Tr. 600, 676.

---

[9] The Commissioner notes in his Response that the ALJ incorrectly attributed a diagnosis to Mr. Malcolm when it was made by Dr. Mahajan.  Doc. 28 at 16, n. 4.

More significantly, even though Dr. Mazurowski and Dr. Mahajan determined that Ms. Peterson's neurologic complaints were psychogenic in nature, there is no evidence they rejected the legitimacy of Ms. Peterson's physiological symptoms.  Thus, while they suggested that psychiatric evaluation, psychotherapy and exercise were preferred treatments in the absence of objective neurologic findings, their suggested therapies and expressed optimism regarding any potential future benefit do not rise to the level of contradictory medical evidence to support rejecting Dr. Conley's opinion regarding Ms. Peterson's ability to do work-related physical and mental activities.  The ALJ's explanation for rejecting Dr. Conley's opinion, therefore, amounts to mere speculation which is improper.  *Langley*, 373 F.3d at 1121.

The ALJ's evaluation of State agency psychological consultant Dr. Suansilppongse is also troubling.  The ALJ stated he accorded moderate weight to Dr. Suansilppongse's opinion. In doing so, the ALJ explained that Dr. Suansilppongse "opined that claimant's affective disorders were severe, but stated that she only had moderate mental limitations.  After reviewing the file and listening to the claimant's testimony, I find that this consistent with the medical evidence summarized above.  However, I have also found that her Post-Traumatic Stress Disorder, Anxiety, and Depression are also severe."  Tr. 26.  Based on this, the ALJ limited Ms. Peterson's work-related mental activities to performing "simple, routine tasks and having only occasional contact with the public."  Tr. 22.

As an initial matter, the ALJ failed to explain at all why, after having assessed more severe mental impairments than Dr. Suansilppongese, he nonetheless rejected Dr. Suansilppongse's assessment that Ms. Peterson should have infrequent contact not just with the public, but with supervisors and coworkers as well.  Tr. 127, 142.  More significantly, the ALJ also failed to explain how limiting Ms. Peterson to "simple, routine tasks" adequately

accounted for the moderate limitations Dr. Suansilppongese assessed in sustained concentration and persistence.  Here, in rating Ms. Peterson's ability to sustain concentration and persistence, Dr. Suansilppongse indicated that Ms. Peterson was moderately limited in her ability to maintain concentration for extended periods *and* in her ability to  complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  Tr. 126.  Although Dr. Suansilppongse's corresponding narrative specifically addressed Ms. Peterson's limitation with respect to maintaining concentration; *i.e.,*  she "would be able to complete tasks at an acceptable pace," Dr. Suansilppongse's narrative did not address how Ms. Peterson's moderate limitation in the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods would impact her ability to perform work-related mental activities on a continuous and sustained basis.  *See generally Carver v. Colvin*, 600 F. App'x. 616, 619 (10th Cir. 2015) (unpublished) (explaining that the consultant's ratings regarding the degree and extent of the capacity or limitation *must be described* in narrative format); *see also Baysinger v. Astrue*, No. 11-333, 2012 WL 1044746, * 5 (D. Colo. March 28, 2012) (unpublished) (citing *Haga v. Astrue*, 482 F.3d 1205, 1208 (10th Cir. 2007)) ("The Tenth Circuit has made clear that the existence of a moderate impairment is not the same as no impairment at all, and that moderate impairments must be addressed by the ALJ in connection with the RFC.").  Moreover, the ALJ did not discuss how limiting Ms. Peterson to "simple, routine tasks" accounted for this moderate limitation or, in the alternative, why he rejected it.

The Tenth Circuit has held that moderate limitations in regard to concentration and pace may be accounted for in an RFC by the restriction that a claimant can perform simple tasks or

23

unskilled work. *See Lee v. Colvin*, No. 15-6027, 2015 WL 7003410, *3 (10th Cir. 2015).  But this is not always the case.  *See Chapo v. Astrue*, 682 F.3d 1285, 1290 n.3 (10th Cir. 2012) (stating that a restriction to "simple work" is a vague catch-all term and insufficient to adequately account for mental limitations).  Although the Court in *Vigil v. Colvin*, 805 F.3d 1199, 1203-04 (10th Cir. 2015), ultimately affirmed that a claimant's moderate mental limitations in concentration, persistence, and pace were sufficiently accounted for by a restriction to unskilled work, the Court reiterated that "[t]here may be cases in which an ALJ's limitation to 'unskilled work' does not adequately address a claimant's mental limitations." Important to the Court's decision was that the moderate limitations at issue—the ability to maintain concentration for extended periods—is listed as "not critical" to the performance of unskilled work. *Id.* at 1204 (citing POMS § DI 25020.010).

Here, although Ms. Peterson's ability to maintain concentration is one of the moderate limitations at issue, it is also uncontroverted that Ms. Peterson is moderately limited in her "ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods."  As stated in POMS § DI 25020.010, the mental abilities needed to understand, carry out and remember simple instructions and the "mental abilities critical for performing unskilled work" include the ability to "complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods."  Unlike limitations in a claimant's ability to maintain concentration, POMS § DI 25020.010 emphasizes in regard to this limitation that "[t]hese requirements are usually strict."  Thus, contrary to the moderate limitations at issue in *Vigil*, the restriction in the RFC to simple, routine tasks did not sufficiently

24

account for this moderate limitation. *See Bowers v. Astrue*, 271 F. App'x. 731, 733-34 (10th Cir. 2008) (unpublished) (noting that moderate limitations in the ability to respond appropriately to changes in a routine work setting could decrease ability to perform simple or unskilled work because it is a general requirement for unskilled work).

In sum, the ALJ accorded moderate weight to Dr. Suansilppongse's opinion related to Ms. Peterson's ability to do work-related mental activities, but failed to explain why he rejected certain of Dr. Suansilppongse's assessed limitations, and failed to explain how limiting Ms. Peterson to "simple, routine tasks" adequately accounted for both of the moderate limitations Dr. Suansilppongse assessed related to Ms. Peterson's ability to sustain concentration and persistence.

For all of the foregoing reasons, the Court finds the ALJ did not apply the correct legal standards assessing Ms. Peterson's RFC and that it is not supported by substantial evidence. This case, therefore, required remand.

## B. Remaining Issues

The Court will not address Ms. Peterson's remaining claims of error because they may be affected by the ALJ's treatment of this case on remand. *Watkins v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003).

## IV. Conclusion

For the reasons stated above, the Court finds Ms. Peterson's Motion to Remand (Doc. 23) is well taken and is **GRANTED.**

_____
**JOHN F. ROBBENHAAR**
**United States Magistrate Judge**